UNCLASSIFIED

**REDACTED**



UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|   |   |
|---|---|
| YASIN MUHAMMED BASARDH ) | |
| ) | |
| Petitioner, ) | |
| ) | |
| v. ) | Civil Case No. 05-889 (ESH) |
| ) | |
| BARACK H. OBAMA *et al.*, ) | |
| ) | |
| Respondents. ) | |

### MEMORANDUM OPINION

Petitioner Yasin Muhammed Basardh ("petitioner" or "Basardh") is a detainee who has been held at the U.S. Naval Base at Guantanamo Bay, Cuba for the past seven years. He alleges that he is being unlawfully detained by respondents President Barack H. Obama, Secretary of Defense Robert M. Gates, Army Brigade General Jay Hood, and Army Colonel Brice Gyurisko.[1]

Before the Court is petitioner's motion for judgment and respondents' opposition thereto. In reaching its decision, the Court has relied upon classified interviews of petitioner and others conducted by law enforcement and intelligence personnel, as well as upon classified information derived from other intelligence sources and methods. The Court also reviewed *ex parte* and *in camera* a top secret-SCI document.[2]

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), if a public officer named as a party to an action in his official capacity ceases to hold office, the Court will automatically substitute that officer's successor. Accordingly, the Court substitutes Barack H. Obama for George W. Bush and Robert M. Gates for Donald H. Rumsfeld.

[2] "[T]he court has inherent authority to review classified material *ex parte*, *in camera* as part of its judicial review function." *Jifry v. Fed. Aviation Admin.*, 370 F.3d 1174, 1182 (D.C. Cir. 2004);



UNCLASSIFIED
**REDACTED**

On March 31, 2009, the Court held a hearing on petitioner's habeas petition. During the classified portion of this proceeding, counsel for both parties presented evidence and arguments regarding petitioner's motion, and immediately thereafter, the Court held an unclassified hearing, which was under seal at petitioner counsel's request, during which counsel for both parties presented legal arguments. Petitioner Basardh listened to the unclassified portion via a live telephone transmission to Guantanamo Bay, Cuba.

At the end of this proceeding, the Court granted the petition for habeas and now issues this Memorandum Opinion to explain the reasons for its decision.

## BACKGROUND

The Court is unable to publicly document all material facts in this case because much of the information has been deemed classified or protected.[3] As a result, the following factual summary is somewhat abbreviated, but it is nonetheless sufficient to explain the Court's decision, since, for purposes of this motion, petitioner's activities prior to his detention at Guantanamo (which are contested by the parties) are not at issue here. Rather the only issue before the Court is a narrow one – what, if any, relevance

---

*see also Bismullah v. Gates*, 514 F.3d 1291, 1292-93 (D.C. Cir. 2008) (en banc) (per curiam) (granting motion for leave to file top secret-SCI declarations solely for judges' *ex parte* and *in camera* review); *Tabbaa v. Chertoff*, 509 F.3d 89, 93 n.1 (2d Cir. 2007) (reviewing classified intelligence *ex parte* and *in camera* "to ensure independently that there was a sufficient basis" for government witness's unclassified statements and finding that "[t]hese materials confirmed what the record available to both parties already made plain").

[3] The Executive has "authority to classify and control access to information bearing on national security," and the Supreme Court has stated that "the protection of classified information must be committed to the broad discretion of the agency responsible, and this must include broad discretion to determine who may have access to it." *Dep't of the Navy v. Egan*, 484 U.S. 518, 527 (1988); *see also Fitzgibbon v. Cent. Intelligence Agency*, 911 F.2d 755, 762 (D.C. Cir. 1990).

does Basardh's ▮▮▮▮▮ have to a determination of the lawfulness of his continued detention?

Petitioner Basardh, a Yemeni national, was arrested ▮▮▮ in early 2002▮ ▮▮▮▮ was transferred to United States custody, and has been detained in Guantanamo Bay, Cuba since 2002. ▮▮▮▮▮▮▮▮▮▮▮▮



5

▮▮▮▮▮▮▮▮▮▮▮▮ spread within Guantanamo, and thereafter, he was subjected to physical attacks by other detainees. *See* Unclassified Summary of Evidence for Combatant Status Review Tribunal, 3, 8 (Oct. 21, 2004) (reporting Basardh "was beaten by other Detainees who believe he is a spy" and "was threatened many times to be killed by other Detainees"); Unclassified Translation of Detainee's Written Statement, 2 (Nov. 8, 2005) ("[M]y family and I are threatened to be killed . . . and this threat happened here in prison for many times."). On March 3, 2006, the Department of Defense, over Basardh's objection, responded to a Freedom of

---

[4] Due to the classified nature of the evidence, the Court cannot be more specific regarding the

5 ▮▮▮

3

Information Act request by releasing to the public transcripts of Basardh's Combatant Status Review Tribunal ("CRST") and Administrative Review Board ("ARB") proceedings. Those transcripts reveal, in unredacted form, that Basardh "cooperated his entire stay while [at Guantanamo]." Unclassified Summary of Evidence for CSRT, 3 (Oct. 21, 2004); *see also* Unclassified Summary of ARB Proceedings for ISN 252, at 5 ("I am cooperative to the point where my cooperation with everyone has led to many people threatening my life."). On February 3, 2009, the *Washington Post* published a front-page article regarding Basardh's cooperation, specifically citing him by name. *See* Del Quentin Wilber, *Detainee-Informer Presents Quandary for Government*, WASHINGTON POST, Feb. 3, 2009, at A1. This article was translated and published in Yemen where Basardh's family lives. In addition, the government has acknowledged that Basardh has suffered physical attacks and has received credible death threats as a result of ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

In addition, throughout this period ▇▇▇▇ the government has encouraged Basardh [6] ▇▇▇▇.[7] These encouragements were reinforced by the

---

[6] The *Post* article reported that Barsardh received privileges not generally available to other detainees, including chewing tobacco, apple pies, magazines, and "other comfort items." Del Quentin Wilber, *Detainee-Informer Presents Quandary for Government*, WASHINGTON POST, Feb. 3, 2009, at A1.

[7] ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

4

written notice provided to each detainee prior to his ARB proceeding. This notice advised the detainee that in making its determination whether a detainee could be released or transferred from Guantanamo, the ARB "will consider . . . if you are working with the United States government trying to help." *See, e.g.*, Notification of the Decision of an ARB ICO ISN 252 to Continue Detention (Jan. 31, 2006). According to the government, this notice was given to petitioner prior to each of his ARB hearings in 2005, 2006, and 2007, pursuant to the Department of Defense procedures governing the administrative review process that "permit[ted] each enemy combatant . . . to explain why he is no longer a threat to the United States and its allies . . . ." Order, Administrative Review Procedures for Enemy Combatants in the Control of the Department of Defense at Guantanamo Bay Naval Base, Cuba, 1 (May 11, 2004). As recognized by these procedures, the law of war permits "detention for the practical purpose of preventing the enemy from rejoining the conflict," *id.*, and therefore, a detainee's need for continued detention (or a "threat assessment") was to be conducted annually "to determine if the enemy combatant remains a threat to the United States . . ." *Id.* at 3.

Despite the ARB's recognition that whether a detainee presented a current threat, including whether he is ▆▆▆▆▆ is relevant to a determination as to whether he



5

should be "release[d], transfer[red], or continue[d] to [be] detain[ed] . . .," *id.* at 5, Basardh has not been cleared for release or transfer but continues to be held as an enemy combatant.[8]

## LEGAL ANALYSIS

Petitioner raises a myriad of novel legal arguments as to why his petition should be granted based on his post-detention conduct and his alienation from enemy forces as a result of his ▮▮▮▮▮ The issue, however, can be decided without resort to the principles enunciated by the Supreme Court in *Santobello v. New York*, 404 U.S. 257, 262 (1971) ("When the plea rests in any significant degree on a promise or agreement of the [government], so that it can be said to be part of the inducement or consideration, such promise must be fulfilled."), or in *DeShaney v. Dep't of Soc. Servs.*, 489 U.S. 189, 199-200 (1989) (recognizing the state-created danger doctrine), or by application of the "arbitrary and capricious" standard of the Administrative Procedures Act, 5 U.S.C. § 706(2)(A).[9]

---

[8] The government has recently abandoned its use of the term "enemy combatant" and no longer asserts that the President possesses inherent detention authority based on his constitutional role as Commander-in-Chief of the armed forces. *See* Respts' Mem. Regarding the Government's Detention Authority Relative to Detainees Held at Guantanamo Bay, Dkt. No. 126 (Mar. 13, 2009). In addition, ARB proceedings are no longer being conducted. Instead, ongoing reviews are being conducted pursuant to Review and Disposition of Individuals Detained at the Guantanamo Bay Naval Base and Closure of Detention Facilities, Exec. Order 13,492, 74 Fed. Reg. 4897 (Jan. 22, 2009).

[9] Given the ARB's failure to explain why petitioner's post-detention conduct, including his extensive ▮▮▮▮▮ did not merit release or transfer, it could certainly be argued that the ARB had violated the principles of the APA. This argument, however, would be met with the claim that the APA is inapplicable due to the exemption in Section 701(b)(1)(G) for "military authority exercised in the field in the time of war, or in occupied territory." While this issue has yet to be decided by the D.C. Circuit, Judge Randolph in his concurrence in *Al Odah v. United States*, 321 F.3d 1134, 1149 (D.C. Cir. 2003), and Judges Green and Kollar-Kotelly have held that the exemption in Section 701(b)(1)(G) does apply. *In re Guantanamo Bay Detainees Cases*, 355 F. Supp.2d 443, 480-81 (D.D.C. 2005), *vac.*, *Boumediene v. Bush*, 476 F.3d 981 (D.C. Cir.

6

Similarly, the Court is spared from having to wade into the debate over whether the due process principles recognized by the Supreme Court in *Hamdi v. Rumsfeld* also apply to a non-U.S. citizen held at Guantanamo. 542 U.S. 507, 525-35 (2004) (plurality opinion) (applying *Matthews v. Eldridge*, 424 U.S. 319 (1976) to a citizen who is held as an enemy combatant); *see also Boumediene v. Bush*, 128 S. Ct. 2229, 2262 (2008); *Kiyemba v. Obama*, Nos. 05-5487, 05-5489, 2009 WL 910997, at *6 n.4 (D.C. Cir. Apr. 7, 2009) (Kavanaugh, J., concurring) (assuming without deciding that Guantanamo detainees "possess constitutionally based due process rights with respect to transfers"); *Kiyemba v. Obama*, 555 F.3d 1022, 1026 (D.C. Cir. 2009) (stating in dicta that "the due process clause does not apply to aliens without property or presence in the sovereign territory of the United States"). Rather, the Court can limit itself to addressing respondents' contention that the Authorization for the Use of Military Force ("AUMF"), Pub. L. 107-40, 115 Stat. 224 (2001), as interpreted by *Hamdi*, authorizes the government to imprison petitioner regardless of whether he continues to pose any threat of returning to the battlefield so long as the United States is still engaged in hostilities with al-Qaeda or the Taliban, and since those hostilities are still ongoing, Basardh's ▓▓▓▓▓ irrelevant to the determination of whether he is lawfully detained. Respondents' position is contrary to both the AUMF and *Hamdi*.

As conceded by the government, its authority to imprison individuals at Guantanamo Bay is derived from the AUMF, which the government contends is "informed by the principles of the laws of war." *See* Respts' Mem. Regarding the Government's Detention Authority Relative to Detainees Held at Guantanamo Bay, Dkt.

---

2007), *rev'd, Boumediene v. Bush*, 128 S. Ct. 2229 (2008); *Rasul v. Bush*, 215 F. Supp.2d 55, 64 n.11 (D.D.C. 2002), *rev'd, Al Odah v. United States*, 103 Fed. App'x 676 (D.C. Cir. 2004).

No. 126, Civ. No. 05-889, at 1, 3-8 (March 13, 2009) (ESH); *see also supra* note 8. The AUMF was passed by Congress in response to the terrorist attacks of September 11, 2001. The AUMF authorizes the President

> to use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks that have occurred on September 11, 2001, or harbored such organizations or persons, *in order to prevent any future acts of international terrorism against the United States by such nations, organizations or persons.*

AUMF § 2(a) (emphasis added).

This statutory language of the AUMF, which defines the Executive's detention authority in plain and unambiguous terms, speaks only to the prevention of *"future* acts of international terrorism against the United States." *Id.* (emphasis added). It does not authorize unlimited, unreviewable detention. Instead, the AUMF requires some nexus between the force (*i.e.*, detention) and its purpose (*i.e.*, preventing individuals from rejoining the enemy to commit future hostile acts). Accordingly, the AUMF does not authorize the detention of individuals beyond that which is necessary to prevent those individuals from rejoining the battle, and it certainly cannot be read to authorize detention where its purpose can no longer be attained.

Consistent with the AUMF, *Hamdi* recognized that the Executive may detain combatants for a limited purpose only. *Hamdi* stated unequivocally that, under the AUMF, "indefinite detention for the purpose of interrogation is not authorized," 542 U.S. at 521 (plurality opinion), that detention of combatants must be "devoid of all penal character," *id.* at 518, and that such detention is "solely protective custody, the *only purpose of which is to prevent the prisoners of war from further participation in the war."* *Id.* (emphasis added). *Hamdi* further explained, "[t]he object of capture is to

8

prevent the captured individual from serving the enemy," and added that prisoners are to be "treated humanely and in time exchanged, repatriated or otherwise released." *Id.* at 518-19 (quoting *In re Territo*, 156 F.2d 142, 145 (9th Cir. 1946)).[10] Simply stated, "the purpose of detention is to prevent the captured individuals from returning to the field of battle and taking up arms again." *Id.* at 518.

As previously noted, this limitation on the Executive's detention authority is consistent with the administrative procedures that the government adopted in 2004 for the CSRT and ARB proceedings for determining whether continued detention of a detainee is justified. In both sets of rules, the government is obligated to perform ongoing threat assessments of detainees based upon the detainee's current status. *See* Order Establishing CSRT 13(i) (July 7, 2004); Memorandum for Secretaries of the Military Departments Chairman of the Joint Chiefs of Staff under Secretary of Defense for Policy, Enclosure 3 (July 14, 2006).

Based on the clear language of the AUMF, as interpreted in *Hamdi*, this Court must conclude that Basardh's current likelihood of rejoining the enemy is relevant to whether his continued detention is authorized under the law. Just as the Court considers "the most current evidence supporting a detainee's detention," *In re Guantanamo Bay*

---

[10] The government has relied extensively on the Ninth Circuit's opinion in *In re Territo* to argue that petitioner can be held until the hostilities are over. But *Territo* is of no help. First, Territo, unlike petitioner, was a prisoner of war, having been captured in uniform on the battlefield in Italy during World War II. 156 F.2d at 143. Second, Territo, while being held as a prisoner of war at a camp in California, voluntarily joined an Italian Service Unit where he worked as a laborer for eighty cents per day but *Id.* Finally, and perhaps most importantly, the *Hamdi* Court cited *Territo*'s recognition of the limited purpose for detention – "The object of capture is to prevent the captured individual from serving the enemy. He is disarmed and from then on must be removed as completely as practicable from the front, treated humanely and in time exchanged, repatriated or otherwise released." *Hamdi*, 542 U.S. at 518-19 (quoting *In re Territo*, 156 F.2d at 145).

9

*Detainee Litig.*, Dkt. No. 39, Misc. No. 08-442 (TFH), as was strenuously argued by the government when it sought leave to amend its factual returns, the Court must also consider the most current evidence relating to whether a detainee is no longer a threat. And, when this evidence is factored into the assessment of the legality of Basardh's detention, it inexorably follows that the requested relief is warranted, for Basardh can no longer constitute a threat to the United States. Basardh has

Given the widespread public disclosure ███████████ any prospect of his rejoining those entities defined in the AUMF is, at best, a remote possibility. The government does not – and cannot – contest this.[11]

Therefore, considering the totality of the circumstances, the Court concludes that the government has failed to meet its burden of establishing that Basardh's continued detention is authorized under the AUMF's directive that such force be used "in order to prevent future acts of international terrorism."[12] The undisputed facts establish that Basardh's ███████ is known to the world, and thus, any ties with the enemy have been severed, and any realistic risk that he could rejoin the enemy has been foreclosed. As a result, the Executive's asserted justification for his continued detention lacks a basis in fact as well as in law.

---

[11] In fact, the government does not argue that Basardh is likely to rejoin those entities upon release, but rather, its counsel declined to offer an opinion on the subject.

[12] Under habeas corpus law, the government bears the initial burden of establishing a sufficient basis for the lawful detention of a person seeking a writ of habeas corpus. *See Boumediene v. Bush*, 128 S. Ct. at 2270; *Hamdi v. Rumsfeld*, 542 U.S. at 533-34. The Case Management Order issued in this case also requires the government to prove, "by a preponderance of the evidence, the lawfulness of the petitioner's detention." *In re Guantanamo Bay Detainee Litig.*, Dkt. No. 940, Misc. No. 08-442 (November 6, 2008) (TFH), *amended by*, Dkt. No. 1316, Misc. No. 08-442 (December 16, 2008) (TFH).

## CONCLUSION

For all the foregoing reasons, and for the reasons stated during the hearing held on March 31, 2009, the Court grants the petition for a writ of habeas corpus. The Court further orders the government to take all necessary and appropriate diplomatic steps to facilitate petitioner's release forewith. The Court, however, must deny petitioner's request that he be released into this country or be transported to a safe haven in light of *Kiyemba v. Obama*, 555 F.3d at 1024.

*/s/ Ellen S Huvelle*
ELLEN SEGAL HUVELLE
United States District Judge

April 15, 2009